Steven W. Soulé (SWS-9908) (admitted *pro hac vice*)
Bonnie N. Hackler (BNH-2974) (admitted *pro hac vice*)
**HALL, ESTILL, HARDWICK, GABLE,
GOLDEN & NELSON, P.C.**
320 South Boston Avenue, Suite 400
Tulsa, Oklahoma 74103-3708
Telephone: (918) 594-0627
Facsimile: (918) 594-0505

**COUNSEL FOR DEFENDANT
WILLIAMS POWER COMPANY, INC.**

**Hearing Date: May 10, 2007
Time: 9:45 AM EST**

## UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>**MAGNESIUM CORPORATION OF AMERICA, ET AL.,**<br><br>    DEBTORS.<br><br>**LEE BUCHWALD, CHAPTER 7 TRUSTEE OF THE ESTATES OF MAGNESIUM CORPORATION OF AMERICA AND RENCO METALS, INC.,**<br><br>    PLAINTIFF,<br><br>V.<br><br>**WILLIAMS ENERGY MARKETING & TRADING CO. N/K/A WILLIAMS POWER COMPANY, INC. F/K/A BARRETT RESOURCES CORP.,**<br><br>    DEFENDANT. | CHAPTER 7<br><br>CASE NO. 01-14312 (REG)<br><br><br><br><br>ADV. PROCEEDING NO. 04-02656<br><br><br>AFFIDAVIT OF BRYAN G. HASSLER IN SUPPORT OF WILLIAMS POWER COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT |

## AFFIDAVIT OF BRYAN G. HASSLER IN SUPPORT OF
## WILLIAMS POWER COMPANY, INC.'S MOTION FOR SUMMARY
## JUDGMENT

STATE OF COLORADO   )
                        )    ss.
COUNTY OF DENVER    )

I, Bryan G. Hassler, being first duly sworn, upon oath state as follows:

1.     This Affidavit is being submitted in support of the *Motion for Summary Judgment* filed herein by Defendant Williams Power Company, Inc. ("WPC"). I have personal knowledge of the facts stated herein and would testify consistently if called upon to do so.

### Barrett Background

2.     I have nearly twenty-six (26) years experience in the oil and gas industry. Over the course of my career, I have worked in the following areas of the oil and gas industry: petroleum and reservoir engineering, pipeline ratemaking, acquisitions, divestitures, storage and midstream development, transportation acquisition, energy marketing and trading. See a copy of my resumé attached hereto as Exhibit "1."

3.     From 1994 to 2000, I was employed by Barrett Resources Corporation ("Barrett"), a Delaware corporation based in Denver, Colorado.

4.     In 2001, The Williams Companies, Inc. ("TWC") acquired Barrett.

5.     Prior to TWC's acquisition of Barrett, Barrett was a publicly traded corporation with two (2) primary business units: (1) oil and natural gas exploration and production and (2) natural gas marketing and trading.

6.     During my tenure at Barrett, I held the following positions: Senior Vice President of Marketing (1999-2000), Vice President of Marketing & Trading (1996-1998) and Manager of

Marketing & Trading (1994-1996).

7.   In my various positions at Barrett, I directed the sale of Barrett's oil and gas production and also managed Barrett's natural gas marketing and trading division.

8.   Barrett's natural gas trading activities involved purchasing natural gas from and selling natural gas to third parties at prices and volumes that management anticipated would generate profits for Barrett from future anticipated changes in the price of natural gas.

9.   Barrett used commodity derivative financial instruments and contracts to hedge price risk associated with the purchase and sale of natural gas at both fixed and index-based prices (such as the Contract between Barrett and MagCorp described below) in its trading activities. Barrett used these financial instruments to reduce sensitivity to price movements, to lock in margins on its trading positions, and to hedge the value of stored gas.

10.   At all relevant times, the volume of natural gas that Barrett's marketing and trading business unit traded was nearly three (3) times the volume of gas actually produced by Barrett.

### Barrett Contract with MagCorp

11.   In March, 1998, in my role as Vice President of Marketing & Trading, I supervised the negotiation of a long term contract for the sale of natural gas by Barrett to Magnesium Corporation of America ("MagCorp"), a company based in Salt Lake City, Utah.

12.   The sale and purchase agreement that Barrett and MagCorp negotiated was memorialized in a form contract produced by the Gas Industry Standards Board, Inc. ("GISB"). See a true and correct copy of the *Base Contract for Sale and Purchase of Natural Gas* dated August 1, 1998 (together with all exhibit and subsequent amendments, the "Contract"). At the time the Contract was entered into, the GISB form contract was widely used in the natural gas

trading industry.

13. It was my understanding that MagCorp required the natural gas to fuel its magnesium plant in Salt Lake City. It was also my understanding that natural gas was essential to MagCorp's magnesium production, and that Barrett was the only supplier of natural gas to MagCorp during the negotiated term of the Contract.

14. The Contract initially had a term of three (3) years that was to commence on August 1, 1998, and end on July 31, 2001. See Exhibit "A" to the Contract, effective August 1, 1998 (the "Original Exhibit 'A'").

15. Effective July 1, 1999, Exhibit "A" to the Contract was replaced and superceded by a new Exhibit "A," which I executed on behalf of Barrett on September 17, 1999, and which MagCorp executed on October 20, 1999, and made effective July 1, 1999. See Exhibit "A" to the Contract, effective July 1, 1999 (the "Amended Exhibit 'A'"). The new term of the Contract extended to June 30, 2002.

16. The Contract was not assignable by either party without the other party's written consent. See the Contract at p. 7, Section 13.1.

17. Pursuant to the Contract (as in effect from July 1, 1999 forward), Barrett was to make available to MagCorp "Approx 20,000" MMBtu of natural gas per day, depending on MagCorp's monthly nomination. See Amended Exhibit "A" at Note 3.

18. The Contract provided that MagCorp was required to advise Barrett in advance how much natural gas MagCorp would be taking per day for the entire next month. Thus, the volume was fixed on a monthly basis.

19. Barrett had to be prepared to supply MagCorp 20,000 MMBtu of natural gas per day for the entire month. This created price and volume risk for Barrett in managing its natural

gas trading portfolio.

20. The Contract price for natural gas that the parties agreed to was "QPC Index Plus $0.0375 Plus Other Costs." Pursuant to the Contract, "Index" was defined as "the price in dollars per MMBtu equal to the Index price for deliveries to Questar Pipeline Company as reported by McGraw Hill's Inside F.E.R.C.'s Gas Market Report in the "Prices of Spot Gas Delivered to Pipelines" table dated the first of the applicable month." See Amended Exhibit "A" to the Contract at Note 1.

21. From 1998 to 2001, Questar Pipeline Company ("QPC") owned and operated the major pipeline delivering natural gas to the Salt Lake City, Utah area.

22. Natural gas is priced and traded at different locations around the country, including market "hubs" and "Citygates." "Citygates" are the locations where local distribution companies receive delivery from a pipeline.

23. At all relevant times, the QPC Index plus cost of transport was the recognized pricing for natural gas delivered to the Salt Lake City, Utah area via the QPC pipeline.

24. The actual delivery point pursuant to the Contract was "point # 164 on Questar" - the Wasatch City Gate. See Amended Exhibit "A" to the Contract at Note 2.

25. At the time the Contract was executed, "Index" pricing was (and still is) a standard pricing method widely used in the natural gas industry for long-term physical sales of natural gas.

26. Pricing under the Contract worked as follows: A few days prior to the first day of each month, a weighted average fixed price for the sale of natural gas into the QPC pipeline for the following month (known as the "Index" price) was published by Inside FERC's Gas Market Report ("Inside FERC"). A few days prior to the beginning of each month, MagCorp would

contact Barrett and provide its nominations for the upcoming month. Barrett would then arrange for delivery of the natural gas volumes that MagCorp nominated under the Contract. Finally, Barrett would invoice MagCorp based upon those delivery volumes at the Index price set by Inside FERC for that delivery month for gas sold into the QPC pipeline plus transport costs. The price that MagCorp paid for natural gas during any given delivery month was fixed.

27.     The monthly index price that MagCorp locked in each month was different from the daily spot market prices. The spot market is active, and trading occurs daily. In the spot market, contracts or agreements to buy and sell natural gas are short-term, with delivery occurring within two (2) business days.

28.     The Contract provided that payment for the natural gas supplied by Barrett to MagCorp would be due on or before the later of (1) the "Payment Date" (defined in the Contract as the 25th day of the month following delivery) or (2) ten (10) days after receipt of an invoice by MagCorp. See the Contract at p. 2, Section 2.21 and p. 5, Section 7.2.

29.     Pursuant to the Contract, all payments were to be made by wire transfer. See the Contract at p. 1, Section 7.2.

30.     The Contract provided that each month following delivery, Barrett would invoice MagCorp for the amount of gas delivered during the prior month. See the Contract at p. 5, Section 7.1.

31.     The invoices generated by Barrett for the gas supplied to MagCorp reflected both the volume of gas delivered to MagCorp each day and also the price of the gas delivered each day. See the Contract at p. 5, Section 7.1. As set forth above, the price of gas was fixed for the entire month at the start of the month.

32.     The invoice and payment procedures set forth in the Contract were part of the

GISB form contract and were standard in the natural gas trading industry at all relevant times.

33.     During my tenure at Barrett, its natural gas trading counterparties paid by wire transfer. It was (and still is) common in the natural gas trading industry for regular monthly payments to be made by wire transfer.

34.     The parties did not use a clearinghouse or other such settlement system.

35.     The Contract was a "firm contact," pursuant to which both parties were legally obligated to either receive or deliver the amount of natural gas specified in the contract for the term of the contract.

36.     The Contract was a "forward contract" as that term is used in the energy trading industry. A "forward contract" is an agreement between two parties to buy or sell an asset at a pre-agreed future point in time.

37.     Barrett routinely entered into forward contracts with its customers as its customers required assurances that their supplies would be available on a firm, ongoing basis into the future. Also, Barrett wanted to hedge against price fluctuations. During my time at Barrett, the majority of contracts that Barrett entered into were "forward contracts."

38.     The Contract was entered into by Barrett in order to generate a profit as part of its normal natural gas trading activity. The Contract was a part of the overall portfolio of energy trading contracts in the Barrett energy trading business unit.

39.     To my knowledge, there were not any payment disputes or other irregularities in the performance of the Contract by either party.

40.     I was not aware of any collection efforts of any kind that Barrett made with respect to payments that MagCorp owed to Barrett pursuant to the Contract.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

_____
Bryan G. Hassler

Subscribed and sworn to before me this _____ day of March, 2007, by Bryan G. Hassler.

_____
Notary Public

My Commission Expires:

06/17/2007
(SEAL)

My Commission No.:

_____