UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | Case No. 01-14312 (REG) |
| MAGNESIUM CORPORATION OF | ) | |
| AMERICA, *et. al.*, | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| LEE E. BUCHWALD, Chapter 7 Trustee of the | ) | |
| estates of MAGNESIUM CORPORATION OF | ) | |
| AMERICA and RENCO METALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| *against* | ) | Adv. Pro. |
| | ) | No. 04-02656 (REG) |
| WILLIAMS ENERGY MARKETING & | ) | |
| TRADING CO., f/k/a BARRETT | ) | |
| RESOURCES CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

DECISION AND ORDER ON CROSS-
MOTIONS FOR SUMMARY JUDGMENT

APPEARANCES:

STEVENS & LEE
485 Madison Avenue
20th Floor
New York, NY 10022
By:    Nicholas F. Kajon, Esq. (argued)
          Jocelyn Keynes, Esq.

HALL ESTILL HARDWICK GABLE GOLDEN & NELSON, P.C.
320 South Boston Ave.
Suite 200
Tulsa, OK 74103
By:    Steven W. Soule, Esq.(argued)
          Bonnie N. Hackler, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this avoidance action adversary proceeding under the umbrella of the chapter 7 case of Magnesium Corporation of America ("**MagCorp**"), chapter 7 trustee Lee E. Buchwald (the "**Trustee**") seeks to recover approximately $4.1 million in allegedly voidable preferential payments that had been made to the predecessor of defendant Williams Power Company, Inc. ("**Williams**") for natural gas that MagCorp consumed in its magnesium processing operations.

The parties cross-move for summary judgment. The Trustee seeks judgment for the recovery of the preferential payments that MagCorp had made (net of new value Williams provided),[1] and Williams seeks summary judgment dismissing the complaint. Williams contends that it is absolved from the potential preference exposure that vendors normally have to their customers because the payments should be deemed "settlement payments" on a "commodities forward contract," made to a "forward contract merchant," that are subject to a safe harbor under section 546(e) of the Code.

The Trustee's motion for *plaintiff's* summary judgment requires little discussion. It raises factual issues for which a determination now is premature, and hence must be denied in any event.[2]

Williams' motion for *defendant's* summary judgment, on the other hand, is much more difficult, as section 546(e) of the Code (along with other Code provisions on which its application depends) is hardly a model of drafting precision. Though policy points are

---

[1]     *See* Bankruptcy Code section 547(c)(1)(A). The bankruptcy community refers to this colloquially as the "New Value Defense."

[2]     Additionally, it could not be granted without rulings in favor of the Trustee on Williams' section 546(e) defense, which cannot now be determined in the Trustee's favor any more than they can be determined in favor of Williams.

1

made by both sides (and those made by the Trustee are particularly compelling), the

question of section 546(e)'s application is still one of statutory construction. It will

ultimately depend most on whether Williams' predecessor (or MagCorp, though in

MagCorp's case, the question is easily answered) was a "forward contract merchant," as

that expression is used in the Code and as its meaning can be divined, with respect to the

transactions at issue here. That issue will require greater factual development, and cannot

be decided as a matter of law, on summary judgment, now.

<u>Facts</u>

Prior to its bankruptcy filing, MagCorp operated a magnesium plant in Salt Lake

City, Utah and was one of the largest producers of magnesium in the United States. Its

manufacturing operations required it to consume natural gas.[3] MagCorp entered into

contracts with natural gas suppliers to purchase the quantity of natural gas that it needed.[4]

In August 1998, MagCorp entered into a four-year "Base Contract for Sale and

Purchase of Natural Gas" (the "**Base Contract**") to buy natural gas from Barrett

Resources Corporation ("**Barrett Resources**").[5] Barrett Resources thereafter became a

part of defendant Williams.

The Base Contract was a form contract with its origins in a form produced by the

Gas Industry Standards Board, which was widely used in the natural gas industry. The

Base Contract did not refer to itself as a "forward contract." According to Lee Brown,

---

[3]      Brown Dep. at 15-16 and 28-29.

[4]      *See id.* at 17.

[5]      The Base Contract originally had a term of three years but was later extended to four years.
Hassler Aff. ¶¶ 14-15. However, as the Base Contract did not fix the purchase price for the gas for
that duration, the four-year duration is not relevant to this controversy, and reference to the four-
year duration distracts the reader from the real issue, which is the period of time going into the
future for which pricing under the Base Contract was set.

MagCorp's representative who negotiated with Barrett Resources, the purpose of the Base Contract, from MagCorp's perspective, was to get natural gas, which was essential to MagCorp's production of magnesium, at the lowest cost possible.[6]

Williams' Vice President of Marketing and Trading, Brian Hassler, explained that Williams not only produced natural gas but was also a natural gas marketer or natural gas intermediary engaged in natural gas trading activities. According to Hassler, these trading activities involved buying and selling natural gas at prices and volumes that management anticipated would yield profit due to anticipated changes in natural gas prices.[7] However, Williams has provided little evidence as to how extensive these activities were, or how much of the company's profits were from trading activity, and to what extent the payments under the Base Contract were related to that trading business— a matter discussed in more detail below.

The Base Contract did not by itself specify the amount of gas to be sold each month or the actual price at which the gas would be sold. Rather, under the Base Contract, MagCorp would provide monthly nominations a few days prior to the first day of each month advising Barrett Resources of the volume of natural gas that it would need per day for the entirety of the next month.[8] The price for the gas to be delivered each month would be determined by the "QPC Index Plus $0.0375 Plus Other Costs," a standard pricing method used in the natural gas industry based on a fluctuating index.[9]

---

[6]      *See* Brown Dep. at 16, 76, and 77.

[7]      Hassler Aff. ¶ 8.

[8]      *Id.* at ¶¶ 17-18.

[9]      *Id.* at ¶ 20. A few days prior to the first day of each month, *Inside FERC's Gas Market Report* publishes a weighted average fixed price for the sale of natural gas into the QPC Pipeline. *Id.*at ¶ 26.

Based on that index, the price of natural gas for MagCorp's purchases during the next month was fixed, for a one-month period, on a monthly basis.[10]

MagCorp never resold or marketed any excess natural gas that it acquired from its suppliers.[11]  Barrett Resources sold natural gas to many customers, as part of its business. Some sales were of natural gas Barrett Resources (or an affiliate) had extracted, and some were of natural gas Barrett Resources obtained as a consequence of its trading activities. But as discussed below, the percentage of Barrett Resources' business that involved forward contracts (and the extent to which it was a *merchant in forward contracts*, as contrasted to being a merchant in natural gas) was not sufficiently fleshed out, nor was the nexus between the particular payments MagCorp made for the natural gas it purchased under the Base Contract and Barrett Resources' business of entering into forward contracts as a merchant.

On May 21, 2001, June 21, 2001, and July 20, 2001, MagCorp made three payments to Williams totaling approximately $4.073 million (the "**Payments**") for natural gas delivered pursuant to the Base Contract in prior months.  On August 2, 2001, MagCorp filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Williams filed a proof of claim for $665,531.19 for goods and services Williams sold to MagCorp from July through August 2001.

The Trustee seeks to avoid and recover the May, June, and July 2001 Payments pursuant to sections 547 and 550 of the Bankruptcy Code.  The Trustee credited Williams

---

[10]    Payment would be due by the latest of either the 25th day following delivery, or 10 days after Williams invoiced MagCorp following delivery. *Id.* at ¶ 28.  However, in the Court's view, the date at which payment was due is not relevant to this motion; rather, it is the time between the date at which the price for the future delivery of the commodity is fixed and the date of delivery.  See the discussion of "Maturity Date of Contract," at page 20 below.

[11]    Brown Dep. at 17.

with that same $665,531.19 for "new value" based on its proof of claim,[12] and thus seeks

recovery of $3,407,854.56.

Discussion

I.

Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."[13]  The moving party bears the initial burden of showing that the undisputed facts

entitle it to judgment as a matter of law.[14]  Then, if the movant carries this initial burden,

the non-moving party must set forth specific facts to show that there are triable issues of

fact, and cannot rely on pleadings containing mere allegations or denials.[15]

In determining a summary judgment motion, it is well settled that the court should

not weigh the evidence or determine the truth of any matter, and must resolve all

ambiguities and draw all reasonable inferences against the moving party.[16]  A fact is

---

[12]     *See* 11 U.S.C. § 547(c)(1)(A).

[13]     FED. R. CIV. P. 56(a), made applicable to this adversary proceeding by FED. R. BANKR. P. 7056; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  The Court notes that Rule 56 was amended in December 2010.  By order of the Supreme Court, the amendment governs "insofar as just and practicable, [in] all proceedings . . . pending."  Supreme Court Order of April 28, 2010. The amended Rule applies to this motion, but the Court also notes that the substantive standard for summary judgment has not been altered.  Advisory Committee Notes to December 2010 Amendment to Rule 56 ("The standard for granting summary judgment remains unchanged.").

[14]     *See Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995); *Ferrostaal, Inc. v. Union Pacific R.R. Co.*, 109 F. Supp. 2d 146, 148 (S.D.N.Y. 2000) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact . . . .").

[15]     *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Kittay v. Peter D. Leibowits Co., Inc. (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 529 (Bankr. S.D.N.Y. 2001) ("[T]he nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.").

[16]     *See Matsushita*, 475 U.S. at 587 (summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 262 (2d Cir. 2001); *Lovejoy-Wilson v. NOCO*

5

material if it "might affect the outcome of the suit under the governing law."[17]  An issue

of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."[18]

The standards for determining a summary judgment motion apply equally to

cases, like the instant one, in which each side moves for summary judgment.[19]  As a

result, "when parties have filed cross-motions for summary judgment, the court 'must

evaluate each party's motion on its own merits, taking care in each instance to draw all

reasonable inferences against the party whose motion is under consideration.'"[20]

## II.

### Trustee's Motion

First, the Trustee moves for "plaintiff's" summary judgment awarding him the

recovery for which he sued.  This aspect of the pending motions raises no difficult issues,

and must be denied.

In responding to the Trustee's claims, Williams came back with two defenses—

the section 546(e) defense and a garden-variety "ordinary course" defense.[21]  To prevail,

---

*Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) ("We . . . constru[e] the evidence in the light most favorable to the non-moving party.").

[17]   *See Anderson*, 477 U.S. at 248.

[18]   *Id.*

[19]   *Bronx Household of Faith v. Board of Educ. of City of New York*, 492 F.3d 89, 96 (2d Cir. 2007) (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

[20]   *Id.* (quoting *Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).

[21]   *See* Bankruptcy Code section 547(c)(2).  The bankruptcy community refers to this colloquially as the "Ordinary Course Defense."  Section 547(c)(2) was amended in 2005, after the filing of MagCorp's chapter 11 case, to broaden its applicability.  But as applicable to this case, it provided:

The trustee may not avoid under this section a transfer—

. . .

(2) to the extent that such transfer was—

6

the Trustee must show two things—that neither Williams' section 546(e) defense, nor its ordinary course defense, has merit.  Neither can be decided now.

First, for reasons described above and below, Williams may turn out to have a section 546(e) defense, but that cannot be determined on this record, and the Court cannot now rule on it in favor of the Trustee any more than it can rule on it in favor of Williams. Second, the ordinary course defense, by its nature, is a fact-intensive one.  Here, as in the great majority of the cases in which it is raised, it should be decided only after trial.[22]

## III.

### Williams' Motion

As discussed above, Williams contends (1) that the Payments Barrett Resources received were "settlement" payments under a commodity forward contract subject to section 546(e), and (2) that Barrett Resources should be deemed to have been a commodity "forward contract merchant" within the meaning of that section.  Thus, Williams contends, section 546(e) provides it with a complete defense to the Trustee's

---

           (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

           (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

           (C) made according to ordinary business terms.

[22]    *See Simon v. Gerdau MacSteel, Inc. (In re American Camshaft Specialties, Inc.)*, 444 B.R. 347, 363 (Bankr. E.D. Mich. 2011) (Shefferly, J.) (In preference case involving ordinary course issues,"[t]he fact intensive analysis required by controlling Sixth Circuit precedent *means that disposition of such cases by summary judgment is unusual*.  But that does not mean that an ordinary course of business defense under the subjective component of § 547(c)(2)(A) can *never* be decided on a motion for summary judgment.") (emphasis added in each case).

avoidance claims.[23]   The Trustee disagrees with each of the premises, and thus the

conclusion.

*A.  Textual Analysis*

As usual, the Court begins with textual analysis.  Section 546, captioned

"Limitations on avoiding powers," provides an array of exceptions to the general ability

of trustees and other estate representatives to recover money or property for the benefit of

the creditor community generally.  Section 546(e), twice amended since the time

MagCorp's chapter 11 case was filed, provided (and still provides) this "safe harbor" to a

variety of different types of avoidance actions (most significantly, fraudulent conveyance

and preference actions), as applied to a number of different types of transactions

(including those involving securities and commodities).  But as relevant here (to a section

547 preference action, with respect to a commodity transaction), and as the Code read at

the relevant time, section 546(e) provided, in relevant part:

> Notwithstanding section[] . . . 547 . . . the trustee
> may not avoid a transfer that is a . . .  settlement
> payment, as defined in section 101 or 741 of this
> title, made by or to [a] . . . forward contract
> merchant . . . that is made before the
> commencement of the case . . . .[24]

Thus, as a textual matter, to qualify for protection under section 546(e), Williams

must prove, with respect to each Payment to Barrett Resources, (1) that it was a

"settlement payment," and (2) that Barrett Resources or MagCorp was a "forward

contract merchant."

---

[23]     Williams Br. 4.

[24]     Bankruptcy Code section 546(e) (after pruning out immaterial matter).  Section 546(e) did not
(and still does not) apply to intentional (as contrasted to constructive) fraudulent transfers, and the
language expressing that exclusion is part of the irrelevant language pruned out here.

Under familiar principles, "[t]he starting point in discerning congressional intent . . . is the existing statutory text . . . ."[25]  And when meaning is plain, the plain meaning of legislation should be conclusive, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."[26]  But in such cases, the intention of the drafters, rather than the strict language, controls.[27]  And "[a]s the Supreme Court has often noted, '[s]tatutory construction [ ] is a holistic endeavor.'"[28]  Statutory provisions (including, and perhaps especially, those in the Bankruptcy Code) must be construed *in pari materia*,[29] and one statutory provision in the Bankruptcy Code cannot be considered without reference to other relevant provisions of the same statute, and its object and policy.[30]

Similarly, as the Second Circuit, speaking through Judge Feinberg, observed in *Capital Communications Federal Credit Union v. Boodrow*:[31]

---

[25]   *Lamie v. United States Trustee*, 540 U.S. 526, 527 (2004) ("**Lamie**"); *see also Kelly v. Robinson*, 479 U.S. 36, 43 (1986) ("**Kelly**").

[26]   *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571(1982) ("**Griffin**")).

[27]   *Id.*; *Griffin*, 458 U.S. at 571.

[28]   *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) (*en banc*) ("**Cybergenics**"), *cert. dismissed*, 540 U.S. 1002 (2003), quoting *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988).

[29]   *See Norton Bankruptcy Law & Practice 2d* § 154:5 (Nov. 2003) ( "Each provision in Title 11 [the Bankruptcy Code] must be read *in pari materia* with every other . . . .  One cannot read any one section in isolation either from the statute as a whole or from any other provision").

[30]   *See Kelly*, 479 U.S. at 43 (in ascertaining the meaning of a statute, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy") (citations omitted); *Cybergenics*, 330 F.3d at 559 (same, quoting *Kelly* ); *In re Teligent, Inc.*, 268 B.R. 723, 733 (Bankr. S.D.N.Y. 2001) (Bernstein, C.J.) (same, quoting *Kelly*). *See also CompuAdd Corp. v. Texas Instruments Inc. (In re CompuAdd Corp.)*, 137 F.3d 880, 882 (5th Cir. 1998) (same, quoting *Kelly*, and preceding its quotation with the observation that "[t]he Supreme Court cautions, however, against an overly literal interpretation of the Bankruptcy Code").

[31]   126 F.3d 43 (2d Cir. 1997).

9

> It is clear that the "starting point in every case involving construction of a statute is the language itself.  But the text is only the starting point," especially when the language is ambiguous.  The Supreme Court has thus explained in interpreting other sections of the Bankruptcy Code that "we must not be guided by a single sentence or [part] of a sentence, but look to the provisions of the whole law, and to its object and policy."[32]

Applying those principles, the Court first examines what the Code tells the reader about what "settlement payment[s]" and "forward contract merchant[s]" are, and the extent to which "plain meaning analysis" is determinative (or even useful) here.

### 1.  "Settlement Payment"

Section 101 of the Code, captioned "Definitions," includes a reference to "settlement payment" that must be considered in any analysis of what a settlement payment is.  Section 101(51A) provides, in full:

> The term "settlement payment" means, for purposes of the forward contract provisions of this title, a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade.

But this is all the Code says about what a forward contract "settlement payment" is.  Many may regard it as a definition in name only, and as circular as its counterpart dealing with settlement payments in the securities transaction area.[33]  It may better be

---

[32]    *Id.* at 49 (citations, including citation of *Kelly*, from which it quoted, omitted).

[33]    A very similar formulation appears in section 741(8) of the Code, where in the context of a *securities transaction*, "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."  As this Court observed in its decision in *Global Crossing Estate Rep. v. Alta Partners Holdings LDC (In re Global Crossing Ltd.)*, 385 B.R. 52 (Bankr. S.D.N.Y. 2008), the section 741(8) definition was aptly described in earlier caselaw to be "as opaque as it is circular."  *Id.* at 57 n.1 (quoting *Brandt*

regarded as merely providing *examples* of settlement payments that are no less included within whatever "settlement payment" means.

The section 101(51A) "definition," making reference as it does to the "forward contract provisions of this title" (of which section 546(e) plainly is one), and to the catchall in its last clause, strongly indicates that only payments "used in the forward contract trade" qualify. But while "forward contract" is defined in the Code,[34] "forward contract *trade*"[35] is not. And though neither section 546(e) or section 101(51A) expressly says so, the Court thinks it must conclude that to be subject to the section 546(e) safe harbor, a commodity "settlement payment" must, at the least, be some kind of payment on a commodity *forward contract*, requiring the Court to consider whether the transaction in question passes muster on that basis.

Particularly where transactions are not routine, courts have had to confront the meaning of "settlement payment" repeatedly, in each of the securities[36] and commodities transaction[37] contexts. And a body of caselaw expressing views as to what "settlement payment" should be deemed to cover has now developed. But textual analysis does not answer this question.

---

*v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 195 B.R. 971 (Bankr. D. Mass. 1996) (Queenan, J.)).

[34]    *See* section 101(25), discussed below.

[35]    Emphasis added.

[36]    *See, e.g.*, *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329 (2d Cir. 2011) ("**Enron**"), *petition for rehearing en banc filed*, No. 09-5122 (2d Cir. Jul. 12, 2011).

[37]    *See Williams v. Morgan Stanley Capital Group Inc. (In re Olympic Natural Gas Co.)*, 294 F.3d 737, 742 (5th Cir. 2002) ("**Olympic Natural Gas**"); *BCP Liquidating LLC v. Bridgeline Gas Mktg., LLC (In re Borden Chems. & Plastics Operating Ltd. P'ship)*, 336 B.R. 214, 225-26 (Bankr. D. Del. 2006) (Walsh, J.) ("**Borden**").

### 2.  *"Forward Contract Merchant"*

The Court likewise must consider whether either MagCorp or Barrett Resources

was a "forward contract merchant."  "Forward contract merchant" likewise appears in the

"Definitions" of section 101.  As applicable to the time when MagCorp's chapter 11 case

was filed, section 101(26) provided, in full:

> The term "forward contract merchant" means a
> person whose business consists in whole or in part
> of entering into forward contracts as or with
> merchants in a commodity, as defined in section
> 761(8) of this title, or any similar good, article,
> service, right or interest which is presently or in the
> future becomes the subject of dealing in the forward
> contract trade.

This provision, in turn, requires the Court to consider compliance with each of the

subsection's elements:

> (1) "whose business consists in whole or in
> part of entering into forward contracts as or with
> merchants"; and

> (2) "in a commodity, as defined in section
> 761(8) of this title . . ."[38]

### (a) Element #2

Flip-flopping the order and taking the two elements in order of difficulty,

consideration of Element #2, on the facts here, is easy.  While section 761(8) of the Code

requires the reader to refer to the Commodity Exchange Act, and to find out what

---

[38]    Section 101(26) then goes on to cover as well one that is a merchant with respect to "any similar
good, article, service, right, or interest which is presently or in the future becomes the subject of
dealing in the forward contract trade," but since all agree that natural gas is a commodity, this
additional language doesn't matter here.

constitutes a "commodity" under the latter, both sides agree, understandably,[39] that

natural gas is a commodity.  The Court takes that as true.

(b) Element #1

But Element #1 requires more extensive textual analysis.  At first blush, language

in the middle of Element #1, saying "in whole or in part," seems to suggest that an entity

may become a "forward contract merchant" with only a peppercorn of activity in entering

into commodity forward contracts.  But aside from its illogic, that suggestion is

unpersuasive, because "in whole or in part" is only a portion of what Element #1 says.

As caselaw discussed below confirms, the "*business*" must be, in whole or in part,

entering into forward contracts, and "*as or with merchants in a commodity.*"

The statute could have been drafted to avoid reference to the "business" "of

entering into forward contracts," and "as or with merchants," if isolated entry into a

forward contract were to be sufficient.  Under the principles discussed above, Element #1

must be read to give all of its words meaning.

3.  *"Forward Contract"*

Then, application of Element #1 (expressly requiring a forward contract merchant

to be in the business of "entering into forward contracts") requires consideration of what

a "forward contract" is.  Likewise, despite the Code's silence on the matter, the Code

must be read to provide that to be a "settlement payment" subject to the section 546(e)

---

[39]    *See, e.g.*, *Borden*, 336 B.R. at 218-19 ("[I]t can hardly be questioned that natural gas is a
commodity under the Code."); *Mirant Americas v. Kern Oil Refining (In re Mirant Corp.)*,
310 B.R. 548, 565 (Bankr. N.D. Tex. 2004) ("*Mirant*") (Lynn, J.) ("[N]atural gas is a
'commodity' . . . .").  *See also Olympic Natural Gas*, 294 F.2d at 740 (assuming that natural gas
was a commodity); *Hutson v. Smithfield Packing Co., Inc. (In re National Gas Distributors)*,
369 B.R. 884 (Bankr. E.D.N.C. 2007) (Small, J.) ("***National Gas-Bankruptcy***"), *rev'd on other
grounds*, 556 F.3d 247, 252 (4th Cir. 2009) ("***National Gas-Circuit***") (same, in each case).

safe harbor, a payment by or to a forward contract merchant must be on a "forward

contract."

The Code defines "forward contract" in section 101(25):

> The term "forward contract" means a contract
> (other than a commodity contract) for the purchase,
> sale, or transfer of a commodity, as defined in
> section 761(8) of this title, or any similar good,
> article, service, right, or interest which is presently
> or in the future becomes the subject of dealing in
> the forward contract trade, or product or byproduct
> thereof, with a maturity date more than two days
> after the date the contract is entered into, including,
> but not limited to, a repurchase transaction, reverse
> repurchase transaction, consignment, lease, swap,
> hedge transaction, deposit, loan, option, allocated
> transaction, unallocated transaction, or any
> combination thereof or option thereon . . . .

Some of that can be pruned for easier understanding.  The most essential part can be read

as saying:

> The term "forward contract" means a contract
> (other than a commodity contract) for the purchase,
> sale, or transfer of a commodity, . . . with a maturity
> date more than two days after the date the contract
> is entered into . . . .

But additional text that follows, which is preceded by the word "including," may be

argued to cast light on what Congress intended a "forward contract" to be:

> including, but not limited to, a repurchase
> transaction, reverse repurchase transaction,
> consignment, lease, swap, hedge transaction,
> deposit, loan, option, allocated transaction,
> unallocated transaction, or any combination thereof
> or option thereon . . . .

As a textual matter, then, a "forward contract" is a contract for the sale of a

commodity with a "maturity date" more than two days after the date the contract is

entered into—and which isn't a "commodity contract."  As a conceptual matter (if one

14

has a basis for going beyond plain meaning), a contract, if it is to be a "forward contract," may have to be more than that.  But since the additional text, quoted above, does not actually modify the language that precedes it (and may instead be read merely as providing examples for the avoidance of doubt), Williams has the better of the argument from a pure textual analysis perspective, before any relevant caselaw is considered.

 (a) *"Maturity Date"*

The term "maturity date," used in section 101(25), is not defined in the Code.  Its meaning must be divined by caselaw, definitions imported from business practice, legislative history, or some other means.

 (b) *"Commodity Contract"*

The term "commodity contract"—identifying a different kind of a contract with respect to the sale of a commodity, which is carved out from the definition of "forward contract"—was not expressly defined for section 101(25) purposes at the time MagCorp's chapter 11 case was filed.

At the same time, another section of the Code, section 761 (in a subchapter dealing with commodity broker liquidations), then had (and still has) a definition for "commodity contract"—providing, in its subsection (4), a variety of definitions for "commodity contract," two of which (with respect to a "futures commission merchant" and "clearing organization," respectively), provide that it is a "contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, *a contract market or board of trade*."[40]  But the Code—and section 101(25) in particular—was silent as to

---

[40]     Bankruptcy Code sections 761(4)(A), 761(4)(D) (emphasis added).

whether any of the definitions of "commodity contract" in section 761 applied also to "commodity contract" as used in section 101(25) (and, if so, which ones).

In 2006, as one of a number of changes in the Code's safe harbor provisions, section 101(25) was amended to expressly incorporate a reference to section 761 into section 101(25).[41]  The parties debate whether this represented a change or merely clarified the law.

The Trustee argues that until the Code was amended in 2006, the term "commodity contract" was not as narrow as it would be if it were defined under one or another of the definitions in section 761, and, by plain meaning analysis, an exclusion of a "commodity contract" would also exclude garden variety supply agreements for the purchase of a commodity.

With the Code then silent, at the relevant time, as to the extent to which a definition taken from section 761 would apply to cases other than commodity broker liquidations, former section 101(25)'s definition of "commodity contract" may fairly be regarded as ambiguous in that respect.  But of course it is a strong candidate for rules of construction that call for use of similar definitions, whenever possible, across the Bankruptcy Code—a conclusion that is borne out in the caselaw and *Collier*, discussed below.

### 4.  *Textual Analysis Conclusion*

Ultimately only some of the issues can be resolved by textual analysis—and the two most important—whether the Payments were "settlement payment[s]," and especially whether Barrett Resources was a "forward contract merchant"—cannot be

---

[41]     Section 101(25) was amended to provide "other than a commodity contract *as defined in section 761*" (emphasis added).

decided by textual analysis alone.  That is especially true in light of the Trustee's

principal contention—that the Payments here were simply for ordinary purchases of

product that happened to be a commodity, under an ordinary supply contract, in a

transaction that the Trustee says did not involve financial markets, hedging, or any of the

concerns to be addressed under the safe harbor provisions.  The interpretive and factual

uncertainties require consideration of the caselaw, and, ultimately, more evidence.

*B.  Analysis with Benefit of Caselaw and Other Sources*

Textual analysis has indicated that the two principal issues, as matters of statutory

construction, are whether Barrett Resources was a "forward contract merchant,"[42] and to

what extent each of the Payments was a "settlement payment."  Each of those issues

turns, in part, on the determination of the statutorily undefined "maturity date" of the

Payments in question, and whether the Base Contract was a "forward contract."  If (but

only if) principles of statutory construction permit, the Court may then consider the

further points forcefully made by the Trustee:  that to be subject to section 546(e) safe

harbor, a commodity transaction should have financial markets or hedging characteristics,

or otherwise invoke the concerns that the safe harbor provisions were enacted to

address—and that overly broad constructions of section 546(e) applicability cut a huge

swath in years of established avoidance action law, here giving certain vendors of

commodities a leg up over all of a debtor's other creditors.

But caselaw and secondary authorities, when juxtaposed with the language of the

Code, address most of the issues, constraining this Court in achieving equal treatment

---

[42]   In particular, the Trustee argues that, as a factual matter, Williams has not yet provided enough
evidence that Barrett Resources was a forward contract merchant, based on the statutory language
requiring that one's "business consists in whole or in part of entering into forward contracts."
Trustee Br. 32.  Ultimately, the Court agrees.  Williams may be able to do so at trial, but it hasn't
conclusively established that yet.

amongst creditors to the extent the Court would otherwise prefer.  Taking the issues in

order of increasing difficulty, the Court considers the caselaw gloss on these matters.

### 1. *"Commodities Contract" Exclusion*

As noted above, the Trustee contends that with "commodity contract" not defined

in section 101(25), that term should be construed in accordance with its plain meaning—

which would cover *any* contract for the purchase of a commodity, including the Base

Contract here—and thus that the section 546(e) safe harbor would not apply.  The Trustee

recognizes that section 761 of the Code, in subsection (4), gives "commodity contract" a

variety of special meanings—two of which refer to a "contract for the purchase or sale of

a commodity for future delivery on, or subject to the rules of, a contract market or board

of trade"—but notes that any definitions based on section 761 were not then incorporated

into section 101(25).  And while the Trustee notes that 2006 amendments to the Code

thereafter expressly incorporated a reference to section 761 into section 101(25), he

regards this as a change in the law.  Though the Trustee's argument is hardly frivolous,

the Court ultimately cannot agree.

This issue has now been judicially considered several times, with courts almost

unanimously having determined, even in pre-2006 law cases, that the exception, in

section 101(25), for a "commodity contract" means only a "commodity contract" as

defined in sections 761(4)(A) and 761(4)(D).[43]  Likewise, *Collier* states that generally

speaking, "forward contracts" are contracts for the future purchase or sale of

---

[43]  *See Olympic Natural Gas*, 294 F.3d at 740-41; *Mirant*, 310 B.R. at 566; *Borden*, 336 B.R. at 218; *National Gas Distributors-Circuit*, 556 F.3d at 256-57.  Though *National Gas Distributors-Bankruptcy* had come to a different view as to this issue, *see* 369 B.R. at 894-95, this was one of the areas where the *National Gas Distributors-Circuit* court differed with the *National Gas Distributors-Bankruptcy* court.

commodities that are not subject to the rules of a contract market or board of trade, and thus

> the terms "commodity contract" and "forward contract," taken together, seamlessly cover the entirety of transactions in the commodity and forward contract markets, whether exchange-traded, regulated, over-the-counter or private.[44]

Though the Court does not regard the issue as one-sided as the weight of the caselaw would suggest—particularly in light of the Supreme Court's repeated reminders as to the importance of "plain meaning,"[45] and the fact that section 761(4) has *five* separate definitions for "commodity contract," only two of which were held to be incorporated—the Court is persuaded by the point first made in *Olympic Natural Gas*, quoting Supreme Court authority, that "[p]resumptively, identical words used in different parts of the same act are intended to have the same meaning," and thus that courts should decline to adopt an interpretation of "commodity contract" in section 101(25) that would conflict with a definition set forth in another portion of the Code.[46]

Thus, even in this pre-2006 case, the Court must take the meaning of "commodity contract" from section 761 of the Code, and as relevant here, from 761(4)(A) and 761(4)(D) of the Code.[47]   The Base Contract accordingly may not be deemed to have

---

[44]   5 COLLIER ON BANKRUPTCY ¶ 556.02 (16th ed. 2010).

[45]   *See* page 9 above.

[46]    *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am. Inc.*, 508 U.S. 439, 460 (1993) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993)).

[47]   Though the earlier cases do not appear to have addressed this, the Court assumes, without deciding, that a "commodity contract" covered under the different definitions in sections 761(4) (B), (C), and (E) would likewise be excluded.  Since none of those could be said to apply to the Base Contract in any event, the fact that section 761(4) has many different definitions would seemingly not matter.

been caught within the parenthetical exclusion of "commodity contract" from the section 101(25) definition of "forward contract."

   2. *Maturity Date of Contract*

   As noted above, section 101(25) of the Code, defining "forward contract," requires the contract to have "a maturity date more than two days after the contract is entered into." But neither that section nor any other defines "maturity date." The Trustee does not seem to argue that this requirement isn't satisfied; the Court understands him to argue, instead, that it isn't conclusive when a contract otherwise fails to have the necessary financial characteristics.

   Because the Court believes that summary judgment must be denied for other reasons, this issue need not be decided definitively now. The Court observes, however, that unless the Trustee can make this Court aware of new facts or facts this Court missed, Williams will be able to show that it has satisfied section 101(25)'s requirements as to "maturity date."

   Though "maturity date" isn't defined in the Code, it necessarily calls for an examination of the time at which the underlying commodity is to be delivered. Here orders were placed at the beginning of each month for deliveries of gas throughout the month. The Court believes that the Base Contract can best be regarded as giving rise to many individual contracts, by reason of monthly nominations of desired product, and then with many deliveries—all at the price fixed at the outset of each month—all or the bulk of which would be for delivery more than two days later. Each of those delivery dates would at least seemingly be appropriately regarded as the "maturity date," and

20

most, if not all, of the various times for performance would be far enough out in time to qualify.

To the extent there is law on point, it supports analysis of this character. In *Mirant*, Judge Lynn considered what "maturity date" should be deemed to mean, in the context of a single netting agreement, and with the recognition that standards to apply, even from *Black's* and the leading treatises, were lacking.[48] He noted that "[t]he term 'maturity' suggests a single date," but was of the view that "maturity" would mean "the due date for commencement of performance," which could, consistent with the legislative history, be a series of transactions.[49] This Court agrees. Where a single contract calls for a series of future contracts pursuant to a "master" agreement, or where one or more contracts call for more than one dates for performance, it may be better to analyze the issue in terms of multiple "maturity date[s]." As summary judgment is being denied now anyway, the parties may want to consider this going forward, or, if they wish, give this Court further briefing and argument on the matter.[50]

---

[48]     *See Mirant*, 310 B.R. at 565 n.26.

[49]     *Id.*

[50]     When they do so, they may want to consider another matter that is of concern to the Court. Though it is not dispositive on this motion, the Court is uncomfortable with mechanical plain meaning reliance on the additional words "after the contract is entered into" in section 101(25). Consistent with Judge Lynn's analysis, and its own, this Court would have thought that it is not the time a "contract is entered into" that determines a forward contract's character; it is rather the time at which the price for future performance is fixed, which may be well after the time the contract is entered into. Here, for example, the Base Contract was entered into back in 1998, for a four-year term, but the extent of its "forward contract" nature was a series of further nominations fixing prices for future performance (*i.e.*, the actual delivery of natural gas) for periods of up to one month. That seems also to be the case in *Borden*, where the contract was entered into in 1997, but there were many later monthly nominations for the natural gas there to be delivered, with prices reset each month to remain fixed for the ensuing month. *See* 336 B.R. at 216, 219.

*3. "Settlement Payment"*

As noted above, to secure the safe harbor of section 546(e), Williams must also show that each of the Payments to Barrett Resources was a "settlement payment." If, as the Court is likely ultimately to find, the Base Contract (or more precisely, each of the monthly nominations, at the prices then set under them) was a "forward contract," the Court will then be able to find that each of the Payments passes muster as a "settlement payment."

As noted above in the Court's textual analysis, "settlement payment" is effectively undefined under section 101(51A), except in the subset of cases where it fits under one of the enumerated examples. But "settlement payment" must mean something. And while the meaning of "settlement payment" is subject to fair debate in the securities area, especially when parties enter into unusual transactions that are a far cry from the evils Congress intended to address,[51] commodity forward contracts usually, if not always, require payments to be made, to satisfy, or "settle," the underlying contractual obligations, in a fairly routine manner.

An issue could be argued to exist, of course, with respect to whether a "settlement payment" would have to be made through a centralized system. But this contention was rejected, in the commodity forward context, in *Olympic Natural Gas*,[52] and the Court sees no basis for concluding differently here.

---

[51]     *See, e.g., Enron*, n.36 *supra.*

[52]     *See* 294 F.3d at 742 ("We reject the Trustee's argument that in order to be exempt from avoidance, a 'settlement payment' must be made on a financial derivative contract, and be cleared or settled through a centralized system.").

The *Olympic Natural Gas* court also relied, as part of its analysis, on a statement in *Collier* that "settlement payment" should be interpreted very broadly." *Id.*, citing 5 COLLIER ON BANKRUPTCY ¶ 546.06[2][b] (presumably 15th ed. rev. 1996). This Court cannot agree with a statement of that generality. If a broad interpretation were necessary to implement the purposes for which the

In the forward contract context, it is reasonable to construe "settlement payment" as the payment that is made when an obligation under a forward contract becomes due. Since by definition, such contracts will not be traded on exchanges and they will normally involve a greater degree of one-on-one dealings than exchange-traded contracts will, it is not unreasonable to consider "settlement payments" to cover one-on-one payments to meet such forward contracts' financial obligations. The Court is likely to find that this requirement has been satisfied here.

### 4. *Barrett Resources as "Forward Contract Merchant"*

The most critical issue here is whether Barrett Resources was a "forward contract merchant" as a matter of law, based on the showing made to date. Ultimately, the Court cannot decide this on the present record.

Once again, analysis in *Mirant* is helpful. Judge Lynn denied summary judgment in *Mirant* based on his view that there were issues of fact as to whether a party was a "forward contract merchant,"[53] and this Court thinks it should too.

As Judge Lynn observed in *Mirant*, the key portion of the definition of forward contract merchant is "a person whose *business* consists in whole or in part of entering into forward contracts as or with a *merchant* . . . ."[54] He rejected the contention, as this Court does, that any person who enters into forward contracts is a forward contract merchant. That would lead to an absurd result. It would also violate the judicial

---

legislation was enacted, the Court would not quarrel with that proposition. But there is much less cause to consider vague language broadly when its application has nothing to do with the legislative purpose, and, especially, when it runs contrary to other, important, bankruptcy principles, such as the equality of treatment amongst creditors. *See, e.g.*, *Howard Delivery Service, Inc. v. Zurich American Ins. Co.*, 547 U.S. 651, 667 (2006).

[53]    *See* 310 B.R. at 570.

[54]    *Id.* at 567 (emphasis by Judge Lynn).

principle that each word in a statute has significance, and must be given meaning in construing the statute.[55]  Judge Lynn concluded, as this Court does, that the use of the terms "business" and "merchant" was significant.[56]

Then noting that neither "merchant" nor "business" is defined in the Code, Judge Lynn looked elsewhere to fill the gaps.  Taking the word "merchant" first, he concluded that a merchant is one that is not acting as either an end-user or a producer.  Rather, he noted, a merchant is one that buys, sells or trades in a market.[57]  And he found that such a meaning for that word in the Code was confirmed by its usage elsewhere.[58]  Filling in the other critical gap, Judge Lynn concluded that "business," as defined by several circuit courts of appeals, is "something one engages in to generate a profit."[59]

Then, and significantly, in analyzing the Fifth Circuit's decision in *Olympic Natural Gas*, Judge Lynn further noted that even if an entity were a forward contract merchant with respect to some transactions, that would not be dispositive, unless it were also shown that the entity acted as such in "enter[ing] into a 'forward contract *with the debtor.*'"[60]

This Court agrees with the analysis in *Mirant* in each of the above respects. Williams may be able to invoke the section 546(e) defense if, but only if, it can show that

---

[55]     *Id.*

[56]     *Id.*

[57]     *Id.*(citing *Black's* at 1001 (7th ed. 1999)).

[58]     *Id.* at 567-68.

[59]     *Id.* at 548 (citing *Professional Ins. Agents v. Comm'r*, 726 F.2d 1097, 1102 (6th Cir. 1984); *Louisiana Credit Union League v. United States*, 693 F.2d 525, 532 (5th Cir. 1982); *Salerno v. Western Casualty & Surety Co.*, 336 F.2d 14, 19 (8th Cir. 1964)).

[60]     *Mirant*, 310 B.R. at 569-70 (emphasis by Judge Lynn), quoting *Olympic Natural Gas*.  Williams acknowledged this, or something very close.  *See* Arg. Tr. 18 ("[I]f you look at the *Mirant* decision, which is probably the most strict, I think you have to prove that you're acting as a forward-contract merchant when you entered into the contract, and that's what our position is on this one.")

Barrett Resources was a merchant in the forward contract trade, entering into such

contracts to generate a profit—and, of course, that Barrett Resources entered into the

Base Contract with MagCorp and received the Payments as part of that business in the

forward contract trade.[61]  And if it turns out, after more evidence is in, that the natural gas

that Barrett Resources sold to MagCorp was its own, and not acquired as part of its

trading business in any way, that may also foreclose Williams from invoking section

546(e).

Looking at the facts now before the Court, the Court cannot now rule in Williams'

favor on this issue as a matter of law.

At oral argument and in the papers, Williams characterized Barrett Resources as a

trading operation that also had an exploration business.  It argued that:

> Barrett Resources here, now Williams, was not
> producing the gas it was selling.  It was a marketing
> company.  We provided the Court with affidavits
> from the person that negotiated and signed this
> contract.  We provided the Court with SEC filings
> from Barrett from the last quarter, March of 2001,
> before Williams purchased Barrett, and those were
> provided in our reply brief, Your Honor, Exhibit D.
> And those documents show, the affidavit and those
> public filings show that what you're dealing with
> here, Your Honor, from Williams and Barrett's side,
> is a gas marketing company.  They were buying and

---

[61]   The Code permits either party to the forward contract to qualify as the "forward contract merchant," and hence to invoke section 546(e).  *See* section 546(e) (covering payments "made by or to" a forward contract merchant).  And in several of the cases in this area, the debtor was a forward contract merchant, or might be able to show that it was one.  *See Olympic Natural Gas*, 294 F.3d at 739 (though counterparty Morgan Stanley was the paradigmatic forward contract merchant, debtor Olympic Natural Gas might have been one too); *Mirant*, 310 B.R. at 566 ("[t]here can be little question that [debtor] [Mirant Americas Energy Marketing] is a forward contract merchant").  But here debtor MagCorp was solely an end-user, a status that forecloses its qualification as a merchant in the product it was consuming, and hence its qualification as a forward contract merchant.  *See Mirant*, 310 B.R. at 567.

selling natural gas all the time.  They weren't just
selling it.[62]

Williams relied, in part, on an affidavit by Bryan Hassler, Barrett Resources'

Senior Vice President of Marketing from 1999 to 2000, who stated that:

> [a]t all relevant times, the volume of natural gas that
> Barrett's marketing and trading business unit traded
> was nearly three (3) times the volume of gas
> actually produced by Barrett.[63]

Randall O'Neal, who never worked at Barrett Resources, but worked for Williams

since it began its trading operations,[64] explained that at Williams:

> [a]s a routine part of its business, and in order to
> meet its purchase and supply obligations and protect
> against the risk of price movement, [Williams]
> frequently has entered and continues to enter into
> contracts for the future purchase or sale of natural
> gas with a maturity date more than two (2) days
> after the date the contracts are executed.[65]

And in passing, without support by affidavit or other proof, or further detail,

Williams' counsel told the Court that Williams had recently "sold its trading book to Bear

Stearns."[66]

Evidence of this character (or part of it) may help support an ultimate Williams

victory, but it doesn't tell the Court enough at this point.  Williams may have taken over

Barrett Resources, but it is what *Barrett Resources'* business was at the relevant times

that matters, not Williams'.  And while Williams presumably hereafter will be able to

introduce financial statements for Barrett Resources' business (after laying a proper

---

[62] Arg. Tr. 14.

[63] Hassler Aff. ¶ 10.

[64] O'Neal is now the Manager of Financial Loss Recovery for the Williams.  O'Neal Aff. ¶ 1.

[65] *Id.* at ¶ 5.

[66] Arg. Tr. 12 (transcription error corrected).

foundation), Williams cannot now secure summary judgment based on its own SEC

filings, which are hearsay,[67] and which in any event do not drill down into the facts with

the necessary detail.

    As importantly or more so, other evidence in the record raises issues of fact with

respect to whether Barrett Resources dealt with MagCorp as a forward contact merchant.

Deposition testimony by Sharon Pomerantz could be found to support a finding that the

relationship between Barrett Resources and MagCorp was merely that of a supplier to a

customer:

>    Q: What type of business was Barrett in?

>    A: Barrett was an operator.  They drilled oil and gas
>    wells, mostly oil–gas wells.  And we marketed that
>    equity gas.[68]

When asked to explain the term "equity gas," Pomerantz explained that "[e]quity

gas is gas that is owned by the company from wells that the company has drilled and

owns a hundred percent of." [69]  When asked if Barrett Resources was selling equity gas to

MagCorp, Pomerantz affirmed that "Barrett in general could have been selling to its

customers equity gas or gas that it purchased from a third party[]".[70]  This testimony cries

out for more testimony.  The Court cannot tell whether Barrett Resources sold MagCorp

"equity gas," or gas Barrett Resources secured from its trading business.  And without

further information, the Court is not able to determine the extent to which Barrett

---

[67]     Hearsay statements not subject to any exception to the hearsay rule may not be considered on a summary judgment motion.  10 COLLIER ON BANKRUPTCY ¶ 7056.05 (16th ed. 2010).  While SEC filings may be introduced by an opponent as admissions of the party that filed them, *see* FED. R. EVID. 801(d)(2), they are hearsay when offered by the party that prepared them.  Williams did not lay a foundation, or argue for, an evidentiary basis for introducing those SEC filings in evidence.

[68]     Kajon Decl, Ex 12, Pomerantz Dep. at 15.

[69]     *Id.* at 66.

[70]     *Id.* at 66-67.

Resources was a trading operation, and, if so, the extent to which MagCorp paid for gas secured as part of such a trading operation.

In short, the evidence is now inconclusive.  The Court has insufficient information concerning the extent of Barrett Resources' trading, its intentions with respect to its trading, or the trading's profitability.  And if it is the case that different divisions or personnel at Barrett Resources did its ordinary sales, on the one hand, and its trading, on the other, the Court does not know which dealt with MagCorp, and to whom MagCorp's payments were made.

It may turn out that Williams will be able to fill in these gaps.  But Williams has not done so yet.  For failure to show at least yet that Barrett Resources was a "forward contract merchant," and that MagCorp dealt with Barrett Resources in that capacity, summary judgment must now be denied.

### 5. Financial Character of the Base Contract and Related Nominations

The most difficult issue is the extent to which a contract, in order to be a forward contract, must have (in addition to the requisite maturity) financial characteristics. Textual analysis tends to favor Williams.  But canons of statutory interpretation, legislative history, and the important bankruptcy policy of equal treatment amongst creditors tend to favor the existence of the requirement argued by the Trustee.  Williams appropriately notes that the Code expresses no "financial characteristics" requirement. The Trustee appropriately notes that section 101(25) sets forth many types of commodity forward contracts that are included within the definition and that these shed light on the

types of contracts that Congress had in mind.[71]  These, the Trustee argues, cannot be ignored in deciding whether or not a contract truly is a forward contract under the Code.

Though the question is fairly debatable,[72] the Court ultimately does not need to decide it—since assuming that there is a requirement that a forward contract have "financial characteristics," it has been satisfied here.  Here it is undisputed that when setting the price for the delivery of the natural gas pursuant to the monthly nominations, in lieu of purchases at the spot price as the spot price might be at each delivery time throughout the month, the parties set a single price, a few days before the beginning of the month, for all deliveries to be made at any time in the ensuing month.  While this single price did not change until it was reset (pursuant to a new index price, a month later), the spot price did not likewise remain constant.

Though the volatility of the natural gas market might (and likely would) vary over time (sometimes being more significant than at other times), the single monthly fixed price for each delivery would substitute for the array of spot prices that would otherwise apply, providing price constancy, and predictability, for that month.  Though setting the price for periods of 30 days likely did not subject the parties to the potential risks that

---

[71]  "including, but not limited to, a repurchase transaction, reverse repurchase transaction, consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement . . . ."

[72]  The Court well understands the Supreme Court's directives with respect to construing statutes in accordance with their unambiguous terms, and has some reluctance to engraft additional terms into a statute—here, additional requirements for securing the statutory safe harbor—that are not already there.  But the Trustee is correct in his point that several courts have considered the contracts' financial character, see *Borden*, 336 B.R. at 219-223; *Lightfoot v. MXEnergy Electric, Inc. (In re MBS Management Services, Inc.)*, 430 B.R. 750, 757 (Bankr. E.D. La. 2010), and 432 B.R. 570, 574 (Bankr. E.D. La. 2010) (Magner, J.), *aff'd* 2011 U.S. Dist. LEXIS 54546, 2011 WL 1899764 (E.D. La. May 19, 2011), or the legislative history, in determining what contracts should be considered to be forward contracts.  *See Olympic Natural Gas*, 294 F.3d at 742 n.5; *Borden*, 336 B.R. at 220-222.

setting the price for a year might, it still substituted a single known price for 30 subsequent individual prices, under circumstances where the latter might go up or down.

That is a transaction with financial characteristics.  Decisions to set prices for a month or 6 months or a year in advance are merely matters of degree; they all have any requisite economic substance, particularly in the context of a statute that considers those decisions material when prices are set for periods beyond 2 days.

Assuming that financial characteristics were required,[73] they were satisfied here.

Conclusion

For the foregoing reasons, both parties' motions for summary judgment are denied.  The parties are to finalize the matters necessary to get the issues teed up for trial.

SO ORDERED.

Dated: New York, New York       _s/Robert E. Gerber_
      October 17, 2011       United States Bankruptcy Judge

---

[73]   In *Borden*, Judge Walsh found that the agreement before him fit "within the plain language of the Code," and determined that "[t]his is enough to end this Court's inquiry."  336 B.R. at 223. However, he went on to analyze the economic substance and the Congressional purpose, concluding, among other things, that the agreement before him was "a commonly used forward contract in the natural gas market."  *Id.*  With the contract here so similar to the one before Judge Walsh, this Court is not of a mind to rule differently.